**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID ROTH, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 05 C 236 Related Case 05 C 803 |
| OFFICEMAX, INC., et al., | ) ) | Judge Joan B. Gottschall |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

This case is a purported class action[1] against OfficeMax, Inc. ("OfficeMax");

Christopher Milliken ("Milliken"), the former President, Chief Executive Officer

("CEO"), and director of OfficeMax; Theodore Crumley ("Crumley"), Chief Financial

Officer ("CFO") of OfficeMax; Thomas Carlile ("Carlile"), Vice President and

Controller of OfficeMax; Michael Feuer ("Feuer"), former Chairman and CEO of

OfficeMax until it was sold to Boise Cascade Corporation ("Boise"); and George Harad

("Harad"), former CEO and Executive Chairman of the Board of OfficeMax.[2] Plaintiffs

allege that OfficeMax as a company, and Milliken, Crumley, Carlile, Feuer, and Harad as

individuals, violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.

§ 78j, and Securities Exchange Commission Rule 10b-5, 17 C.F.R § 240.10b-5.

Plaintiffs also allege that the defendants were "control persons" who are liable under

---

[1] On June 9, 2005, Wayne County Employees' Retirement System ("Wayne County") was appointed as lead plaintiff.
[2] Plaintiffs have apparently dropped their claims against Gary Peterson ("Peterson"), the former President of OfficeMax's Retail Division.

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78(t), for OfficeMax's fraudulent acts.

On September 12, 2006, this court granted defendants' motion to dismiss plaintiffs' complaint because plaintiffs failed to plead scienter as to any of the defendants with the requisite particularity. *Roth v. OfficeMax, Inc.*, No. 05 C 236, 2006 WL 2661009 (N.D. Ill. Sept. 12, 2006) ("Sept. 12, 2006 Order"). Plaintiffs subsequently filed their First Amended Consolidated Complaint (the "Amended Complaint") and defendants have moved to dismiss that complaint for pleading deficiencies under the Private Securities Litigation Reform Act ("PSLRA") and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion to dismiss is granted.

## I. BACKGROUND

In July 2003, Boise Cascade Corporation ("Boise") announced its proposed acquisition of OfficeMax ("old OfficeMax"). The acquisition was approved by the shareholders of both companies on December 9, 2003. In October 2004, Boise sold its forest products assets and renamed itself OfficeMax, Inc. ("OfficeMax" or "the Company").[3]

On December 20, 2004, the Company announced an investigation into "claims by a vendor to its retail business that certain employees acted inappropriately in requesting promotional payments and in falsifying supporting documentation for approximately $3.3 million in claims billed to the vendor by OfficeMax during 2003 and 2004." On January 12, 2005, OfficeMax announced that its fourth quarter 2004 financial results would be delayed pending the outcome of the investigation. Based on the investigation, the

---

[3]For simplicity, the court will refer to the post-acquisition company as "OfficeMax" or "the Company." If the court is referring to pre-acquisition OfficeMax or Boise, it will explicitly say so.

Company ultimately restated its financial results for the first three quarters of 2004, finding that net income had been overstated in the first quarter by $7.1 million and understated in the second and third quarters by approximately $1 million in each quarter. The Company has stated that 2003 results were not materially impacted. The Company terminated six employees as a result of the investigation.

This court dismissed plaintiffs' prior complaint because although plaintiffs alleged that all of the defendants except for Feuer made statements that may be actionable, nothing in the complaint supported a strong inference that any of those defendants had the required state of mind when they made their allegedly false and misleading statements. *See* Sept. 12, 2006 Order at 14. Specifically, plaintiffs did not allege that any of the defendants knew about the improper vendor income reporting or that the improper reporting was obvious. The court granted plaintiffs leave to amend their complaint, which is the complaint at issue. Defendants have moved to dismiss the amended complaint for failure to adequately plead scienter.

## II. DISCUSSION

### A. Section 10(b) and Rule 10b-5

The Private Securities Litigation Reform Act ("PSLRA") requires fact-pleading that exceeds even the particularity requirement of Rule 9(b) of the Federal Rules of Civil Procedure. Under the PSLRA's heightened pleading requirement, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

mind," § 78u-4(b)(2). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2508 (2007). "That 'required state of mind' is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham et al. v. Baxter Int'l Inc. et al.*, No. 06-1312, -- F.3d --, 2007 WL 2142298, at *1 (7th Cir. July 27, 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998)).

After this court's prior opinion was issued, the Supreme Court issued its opinion in *Tellabs*, which was meant to "prescribe a workable construction of the 'strong inference' standard." *Tellabs, Inc.*, 127 S.Ct. at 2509. First, as with any Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true. *Id.* Second, the court must consider the complaint in its entirety; the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Third, the court must take into account plausible competing inferences. *Id.* Specifically, plaintiffs cannot "merely . . . allege facts from which an inference of scienter rationally could be drawn." *Id.* at 2510 (internal citations omitted). Rather, plaintiffs must "plead with particularity facts that give rise to a 'strong'—i.e., a powerful or cogent— inference." *Id.* The court's inquiry in this regard is "inherently comparative"; a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

The Supreme Court did not, however, disturb the Seventh Circuit's requirement that plaintiffs must create the strong inference of scienter "with respect to each individual

defendant in multiple defendant cases." *Id.* at 2511, n.6 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006)). Nor did the Supreme Court address the question whether and when recklessness satisfies the scienter requirement. *See Tellabs, Inc.*, 127 S.Ct. at 2507 n.3. The Seventh Circuit has stated that reckless conduct involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044-45 (7th Cir. 1977)

Although plaintiffs have alleged that statements issued by the Company regarding its financial results for the first three quarters of 2004 and statements that the Company had no internal control problems may have been false or misleading,[4] it is now well established that a securities complaint will not survive a motion to dismiss if plaintiffs simply point to statements that are later revealed to be misleading or untrue. Importantly, mere allegations of GAAP violations, the restatement of income, or statements regarding the internal controls of a company that are later proven to be false, are not sufficient to demonstrate that those who made the statements committed securities fraud. *See Higginbotham*, 2007 WL 2142298, at *5 (dismissing claim that defendants "'knew' the financial controls in Brazil to be inadequate yet failed to disclose this to investors until July 22" when hindsight was the only basis of the proposed inference); *c.f. Ezra Charitable Trust v. Tyco Intern., Ltd.*, 466 F.3d 1, 10 (1st Cir. 2006) ("The simple fact of

---

[4] This court previously held that the Company-issued statements announcing the Company's financial results and the Sarbanes-Oxley certifications stating that the Company had no internal control problems may be actionable because the Company restated its financial results for the first three quarters of 2004 and because the Company has stated that it had internal control problems that allowed vendor income to be incorrectly reported. *See* Sept. 12, 2006 Order at 7.

a correction is also not particularly probative; plaintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("The mere publication of inaccurate accounting figures or failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or must be severely reckless in publishing such information."); *Higginbotham v. Baxter Intern., Inc.*, Nos. 04 C 4909, 04 C 7096, 2005 WL 1272271, at *7 (N.D. Ill. May 25, 2005) ("Overstatements of income or revenues are not by themselves sufficient to draw an inference of scienter." (collecting cases)). There must also be other allegations, direct or circumstantial, that together will support a strong inference of scienter. Otherwise such allegations amount to pleading fraud by hindsight.

With these considerations in mind, the court turns to plaintiffs' allegations of scienter.

### B. Group Allegations of Scienter

Plaintiffs have not alleged in the Amended Complaint that any of the individual defendants knew about the problems that caused the restatement of the Company's financials—i.e., the improper vendor income reporting, the alleged GAAP violations or the deficiencies in the internal controls—at the time the allegedly false and misleading statements were made. Plaintiffs have instead attempted to bolster their allegations of scienter by leveling a number of generalized allegations at all the individual defendants together. Specifically, plaintiffs allege: 1) the defendants ignored certain "red flags" that should have notified them of the improper vendor income reporting, the GAAP violations and the deficiencies in the internal controls; 2) defendants knew about an internal

investigation into the vendor income reporting sometime in the summer or fall of 2004; and 3) based on an accounting expert's declaration, defendants could not have certified that OfficeMax's internal accounting controls were sufficient without departing from the standards of ordinary care. The court addresses each allegation in turn below and then applies them to the individual defendants to evaluate whether all the allegations together support a strong inference of scienter. *See Tellabs, Inc.*, 127 S.Ct. at 2509 ("the inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter."); *Makor Issues & Rights, Ltd.*, 437 F.3d at 603 (plaintiffs must create the strong inference of scienter with respect to each individual defendant in multiple defendant cases).

### 1. *"Red Flags"*

First, plaintiffs claim that it is reasonable to infer that the Company and the individual Defendants knew about various events—which plaintiffs call "red flags"—that occurred over the summer of 2004 such as: 1) vendor complaints which eventually led to rebates to vendors;[5] 2) a representative from a vendor named Pintel making an "unannounced visit" to OfficeMax employees Kettlewell and Roche for the purpose of reclaiming improper deductions; 3) threatened litigation by vendors; and 4) certain vendors putting OfficeMax on credit hold. Pl.'s Opp. 12-13, 16-17; Am. Compl. ¶¶ 9, 58, 77, 78, 80. Plaintiffs do not allege that the individual defendants actually knew about these red flags. Rather, plaintiffs claim that such "red flags do not go unnoticed in a Company, [sic] which employees described as having a 'top-down' management style that was very 'authoritarian' such that the Defendants were knowledgeable about and

---

[5] Plaintiffs do not allege when these rebates occurred.

involved in all aspects of the Company's financial performance." Pl.'s Opp. 17, Am. Compl. ¶ 35.

This is not a particularized basis for inferring scienter. *See In re Bally Total Fitness Securities Litigation*, No. 04 C 3530, 2006 WL 3714708, at *9 (N.D. Ill. July 12, 2006) (rejecting plaintiffs' theory that senior executives "must have known" about accounting fraud because misstatements were related to company's core business as an "attempt at an end-run" around the requirement that plaintiffs set forth particularized facts to suggest that defendants acted knowingly or recklessly). Although an allegation that defendants actually knew about "red flags" might be sufficient to bolster allegations that those defendants must have known about the fraud or at least recklessly disregarded a risk of fraud, unsupported allegations that defendants "must have known" about such red flags are insufficient to draw any inference, much less a compelling one, of scienter.

## 2. The Internal Investigation

Second, plaintiffs allege that defendants, with the exception of Feuer, who had already left the Company, knew about an internal investigation of the allegedly fraudulent accounting practices well before December 20, 2004,[6] which is when the internal investigation was announced by the Company. Pl.'s Opp. 9; Am. Compl. ¶¶ 44-45.

The Seventh Circuit recently held that demonstrating knowledge of accusations of fraud falls short of demonstrating knowledge of fraud. *See Higginbotham*, 2007 WL 2142298. That case arose from Baxter International's July 22, 2004 announcement that it was restating the prior three years of earnings due to accounting fraud at its Brazilian

---

[6] Plaintiffs do not specify when they believe the investigation actually began but by their own allegations, the earliest it could have commenced was the summer of 2004.

subsidiary. *Id.* at *1. The restatement caused a drop in the value of Baxter's stock. *Id.*
Plaintiffs described, as the fraudulent statements, the income and earnings figures in
Baxter's 2004 10-K report filed on March 12, 2004 (covering financial information
through the end of 2003), and its 10-Q report filed on May 10, 2004 (covering financial
information for the first quarter of 2004). *Id.* at *3. Those documents contained false
information that the Brazilian subsidiary reported to Baxter's headquarters. *Id.* Plaintiffs
asserted that by March 12 or May 10 Baxter's senior managers (the ones who signed the
reports) knew the Brazilian data to be false, or were recklessly indifferent to its accuracy.
*Id.* Plaintiffs also maintained that Baxter's senior managers knew (and failed to disclose)
that the Brazilian subsidiary had inadequate financial controls, and that even if Baxter did
not learn of the Brazilian fraud until after May 10 it should not have waited until July 22
to disclose the problem. *Id.*

The court held that the plaintiffs did "not proffer concrete evidence that anyone at
Baxter's headquarters in the United States knew of the shenanigans in Brazil until May
2004." *Id.* at *3. In response to plaintiffs' allegation that Baxter was informed of the
accounting fraud "sometime in the May time frame" before the company's 10-Q report
was issued on May 10, the court stated, "Knowing enough to launch an investigation
(Baxter could not simply assume that the initial report of bad news was accurate) is a
very great distance from convincing proof of intent to deceive." *Id.* at *4.

Here, plaintiffs allege that "as early as summer 2004, vendors began to discover
OfficeMax's fraudulent charges." Pl.'s Opp. 9; Am. Compl. ¶¶ 77, 78. Plaintiffs offer
the example of Pintel, a vendor that was so angry that it threatened lawsuits and sent a

representative to meet with Kettlewell and Roche, two OfficeMax employees.[7] "Sometime after the vendor complaints started, OfficeMax began an internal investigation of these fraudulent accounting practices." Pl.'s Opp. 9, Am. Compl. ¶ 45. On December 16, 2004, pursuant to an agreement made in connection with its December 2001 public offering, OfficeMax redeemed securities issued in December 2001 with over 5 million shares of OfficeMax common stock. Am. Compl. ¶ 44. On December 20, 2004, OfficeMax announced that it had commenced an investigation into certain vendor allegations and that it was postponing a decision on the form and timing of equity repurchases until the investigation was complete. *Id.* Plaintiffs allege that "the internal investigation had been going on for weeks, if not months prior to the . . . disclosure" and argue that the "only logical inference is that Defendants knew the accounting scandal was material information to investors and that disclosing the existence of the investigation would preclude the Company from being able to issue securities." Pl.'s Opp. 10; *see also* Am. Compl. ¶ 45.

Plaintiffs do not allege than any of the individual defendants knew of the investigation—or the events that led up to the investigation—at the time they made the allegedly false and misleading statements; rather, plaintiffs contend that "certain employees"[8] knew of the internal investigation far in advance of its public disclosure and that "defendants (other than Feuer) cannot reasonably assert that such an investigation would have been hidden to them despite the investigation having been approved by the Company's audit committee."[9] Pl.'s Opp. 11. As discussed above, such generalized and

---

[7] Neither of these employees is named in the complaint and there is no allegation that either employee discussed the meeting with any of the named defendants.
[8] Plaintiffs do not specify who these employees are.
[9] Plaintiffs do not allege when the Company's audit committee approved the investigation.

conclusory assertions do not satisfy the heightened pleading standard imposed on securities actions by the PSLRA. [10]

Therefore, absent allegations that the defendants knew about the internal investigation at the time they made the allegedly false statements, plaintiffs' allegations regarding the internal investigation do not create a strong inference of scienter. Indeed, even if plaintiffs could allege that defendants knew about the internal investigation prior to December 16, 2004, such allegations do not demonstrate that the defendants acted with the required state of mind when they made the allegedly false and misleading statements regarding the Company's financial results and internal controls. As was the case in *Higginbotham*, plaintiffs do not allege that any of the individual defendants knew that accounting fraud was occurring. That defendants may have known enough to "commence" an investigation is not enough to prove that defendants had intent to deceive. *See Higginbotham,* 2007 WL 2142298, at *4 ("Accusations differ from proof; business executives are not charged with 'knowing' the truth of whatever any public official anywhere in the world may assert.").

### 3. *Zimmerman Declaration*[11]

Plaintiffs attempt to bolster their allegations of fraud with the declaration of Sheldon D. Zimmerman, an accounting expert retained by plaintiffs' counsel "to opine as

---

[10] Plaintiffs also allege that defendants "concealed" the internal investigation of OfficeMax's fraudulent accounting in order to issue millions of shares to investors. To the extent that plaintiffs are alleging that the December 20, 2004 announcement was materially false, this claim also fails for a variety of reasons. Even if plaintiffs could allege that the Company had commenced the investigation weeks or months earlier, and that the individual defendants knew about this fact, plaintiffs have not identified the rule of law requiring defendants to disclose the existence of the investigation any earlier. *See, e.g., Higginbotham,* 2007 WL 2142298, at *6 ("Silence is not 'fraud' without a duty to disclose. . . . Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal.").

[11] Plaintiffs filed the Zimmerman Declaration as an attachment to the Amended Complaint. Defendants filed a motion to strike the Zimmerman Declaration. The court is unwilling to strike documents attached to the complaint at the motion to dismiss stage though it notes that such attachments are problematic; plaintiffs would be better advised to simply put the contents of the declaration into their complaint.

to whether or not the senior management of OfficeMax, Inc. . . . should have been aware of the internal control weaknesses which did not detect the overstatement of income recorded relating to vendor rebates and allowances."  Zimmerman Decl. ¶ 5.  Plaintiffs do not allege that Zimmerman ever worked at OfficeMax or has personal knowledge of the inner workings of the Company.  Rather, Zimmerman's analysis is based on his review of the plaintiffs' two complaints, this court's September 12, 2006 Order, and various financial statements included in OfficeMax's filings with the SEC.  *Id.* ¶ 7.

Zimmerman opines that "vendor rebates were significant to OfficeMax's earnings" and "[i]t is clear that senior management of OfficeMax were aware of the accounting issues surrounding vendor allowances."  *Id.* ¶¶ 8, 11.  Thus, Zimmerman opines that he "would have expected no less than a fully functioning system with proper reporting under GAAP of the financial ramification of the vendor rebate and merchandizing programs."  *Id.* ¶ 13.  Zimmerman does not opine that defendants were aware of the accounting fraud or that the fraud was obvious.  Indeed, Zimmerman does not even opine that the senior management of OfficeMax should have been aware of the internal control weaknesses.  Zimmerman's opinion is not based on any facts whatsoever.  This is not a permissible way for plaintiffs to get around the PSLRA requirement that they allege specific facts demonstrating scienter.  *See Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (opinions cannot substitute for facts under the PSLRA).

Plaintiffs rely on the Zimmerman Declaration to support their allegation that "[g]iven the significance of the Company's vendor rebate program and the substantial deficiencies in the Company's internal controls, defendants either knowingly committed

fraud or were acting with extreme recklessness in assuring investors that OfficeMax's financial statements were prepared in compliance with GAAP."[12] Pl.'s Opp. 15. However, plaintiffs do not allege specific facts that demonstrate that any of the defendants knew about the deficiencies in the Company's internal controls or that those deficiencies were obvious. An allegation that defendants should have known about internal control deficiencies based on nothing more than later acknowledgment of such weaknesses amounts to pleading fraud by hindsight. *See Higginbotham*, 2007 WL 2142298, at *5. As the court in *Higginbotham* put it, "by definition, all frauds demonstrate the 'inadequacy' of existing controls." *Id.* The existence of inadequate controls alone does not demonstrate that those who made statements regarding those controls necessarily acted with the intent to deceive. Even assuming the allegations within the Zimmerman Declaration are true, the declaration does not provide specific facts that support a strong inference of scienter against any of the defendants.

With these holdings in mind, the court evaluates plaintiffs' allegation of scienter as to each defendant.

### C. Feuer

Feuer founded old OfficeMax in 1988 and served as its Chairman and CEO until old OfficeMax was sold to Boise on December 9, 2003. Am. Compl. ¶ 28. This court previously dismissed plaintiffs' claims against Feuer because plaintiffs had failed to allege that Feuer made any false or misleading statements. *See* Sept. 12, 2006 Order at 6.

---

[12] The Amended Complaint alleges that Crumley, Milliken, and Harad signed SEC filings and sworn Sarbanes-Oxley filings stating they had personally evaluated and certified the effectivness of the Company's disclosure controls and procedures during the Class Period. Am. Compl. ¶¶ 65, 66, 68, 72, 75.

Plaintiffs have not remedied this defect.[13]  Pl.'s Opp. 22-23.  Therefore, Count I as to

Feuer is dismissed.

### D.  Milliken

At the time that Boise acquired OfficeMax, Milliken was the division president

and CEO of Boise Office Solutions.  In November of 2004, Milliken was elected as CEO

of the Company.  Am. Compl. ¶¶ 24, 27.  On November 9, 2004, Milliken signed the

Form 10-Q for the third quarter 2004, which included a certification that he had

personally supervised the evaluation of the design and operation of the Company's

disclosure procedures and internal controls pursuant to Rule 13a-15(e) of the 1934 Act

(§392 of Sarbanes-Oxley).  *Id.* ¶ 32, 75.  Plaintiffs allege that Milliken received a bonus

of $396,415 for 2004 in addition to his salary of $753,577.  *Id.* ¶ 24.

On December 20, 2004, OfficeMax announced that it had commenced an

investigation into certain vendor allegations and that it was postponing a decision on the

form and timing of equity repurchases until the investigation was complete.  *Id.* ¶ 44.  On

---

[13] Plaintiffs argue instead that Feuer had a duty to disclose that he knew the Company's financial statements were the product of manipulations caused by over-billing vendors.  Even if Feuer did have such a duty, plaintiffs do not state with particularity facts giving rise to a strong inference that Feuer was aware of the improper recording of vendor income or that support plaintiffs' generalized conclusion that Feuer caused OfficeMax to cook its books in the period of time leading up to the merger.  Plaintiffs allege that there was a "common, notorious practice at OfficeMax to bill venders for marketing and promotion services to be rendered by OfficeMax at some time in the future" while booking those payments in the present.  Am. Compl. 5.  This practice was referred to at the Company as "leveraging the future."  *Id.* Plaintiffs allege that Feuer personally instructed Ryan Vero, the OfficeMax Executive Vice-President of Merchandising, to oversee this process to ensure that the Company made its numbers at the end of reporting periods during the Class Period.  *Id.*  Plaintiffs have not specified how they know this, whether Vero actually obeyed Feuer's instruction, or when this instruction was made.  *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (10b-5 plaintiffs must plead the "who, what, when, where, and how" of fraud with particularity); *compare Higginbotham v. Baxter Intern., Inc.*, No. 06-1312, -- F.3d --, 2007 WL 2142298, at *1 (7th Cir. July 27, 2007) (interpreting *Tellabs* to mean that a court must "discount" allegations attributed to confidential witnesses because it is hard to see how information from anonymous sources could be deemed "compelling" or how the court could take account of plausible opposing inferences).

February 14, 2005, Milliken resigned as president, CEO and director of the Company. *Id.* ¶ 90.

Plaintiffs argue that Milliken was severely reckless in signing the November 9 SEC filing and sworn Sarbanes-Oxley certification because OfficeMax subsequently admitted in its Form 10-K for the year ending December 31, 2004, that there was a material weakness in its internal controls. *See* Pl.'s Opp. 14; Am. Compl. ¶ 113. Plaintiffs also allege that Milliken failed to disclose the existence of a fraudulent scheme to improperly charge vendors and that given the significance of the vendor rebate program and the substantial deficiencies with regard to internal controls, Milliken was acting with extreme recklessness in assuring investors that OfficeMax's financial statements were prepared in compliance with GAAP. Pl's Opp. 26; Am. Compl. ¶ 39. The court held that these allegations were insufficient to support a strong inference of scienter as to Milliken. *See* Sept. 12, 2006 Order at 11.

The Amended Complaint does not contain allegations that Milliken was aware of the accounting fraud at OfficeMax, about the weaknesses in the Company's internal controls, or about the internal investigation at the time he signed the November 9, 2004 10-Q. Rather, plaintiffs argue that "[a]t least by the date Milliken signed the Form 10-Q field [sic] with the SEC, OfficeMax vendors had begun to learn of the fraudulent scheme and were then notifying the Company that the vendors would pursue litigation to reclaim the illegal deductions if the problem was not immediately remedied" and that OfficeMax was reimbursing "huge sums of money" to vendors such as Pintel and was beginning an internal investigation. Pl.'s Opp. 26; *see also* Am. Compl. ¶¶ 75-76. However, as discussed above, plaintiffs do not allege that Milliken was aware of any of these so-called

"red flags" or the investigation prior to the time he signed the Form 10-Q. Rather, plaintiffs allege that "[t]hese are the sorts of facts a CEO can hardly claim to be ignorant of." Pl.'s Opp. 26. This is not a particularized basis for inferring scienter. Furthermore, it is unclear from the complaint how Milliken could know about events that occurred over the summer and fall of 2004 by virtue of his position as CEO of the company if he did not begin his term as CEO until November of 2004.[14] Count I is dismissed as to Milliken because the complaint does not adequately allege scienter as to him.

### E. Carlile

Carlile was the Vice President and Controller of OfficeMax. The complaint alleges he was responsible for financial reporting and communication with the market and that many of the internal reports showing OfficeMax's financials were prepared under his oversight. Am. Compl. ¶ 31. Carlile signed the Company's Form 10-K for fourth quarter 2003 and the Company's Form 10-Q for the first two quarters of 2004. The court held that these allegations did not support a strong inference of scienter in its previous order. *See* Sept. 12, 2006 Order at 10.

Although Carlile's position as Controller and his signature on the SEC filings indicate that he was involved in the preparation of the Company's financial statements, there are no allegations that Carlile was aware of the improper recording of vendor credits, the weaknesses in the Company's internal controls, or any of the various "red flags" that plaintiffs assert should have put defendants on notice of such problems. Nor

---

[14] Plaintiffs also argue that the timing and nature of the resignations and/or terminations of Milliken, Crumley, Peterson, and Anderson are "highly suggestive of their involvement in or tacit approval of" the alleged fraud. Pl.'s Opp. 18. The court fails to see how Peterson and Anderson are relevant given that they are not named defendants in this action. As for Milliken and Crumley, by plaintiffs' own allegations, neither defendant was terminated; both resigned. Am. Compl. ¶¶ 81, 90. Plaintiffs have not cited authority supporting the proposition that an individual's resignation from a company is sufficient to create an inference—much less a strong one—of scienter as to that individual.

are there any allegations that Carlile was aware of the existence of an internal investigation prior to December 20, 2004 or the various events that led up to the commencement of the investigation. Count I is dismissed as to Carlile because the complaint does not adequately allege scienter as to him.

### F. Crumley

Crumley acted as CFO of the Company from the time of the OfficeMax acquisition until November 11, 2004, when he resigned. Am. Compl. ¶ 81. Crumley signed the Form 10-K and Sarbanes-Oxley certifications for the fourth quarter 2003, the Sarbanes-Oxley certifications for first and second quarters of 2004, and the Form 10-Q for the third quarter 2004. He received a bonus of $487,829 for 2004 in addition to his salary of $507,586. Am. Compl. ¶ 25.

This court previously held that plaintiffs failed to allege scienter as to Crumley even though Crumley was involved in the preparation of the Company's financial reports and SEC filings and signed every filing made during the class period because there was nothing in the complaint to indicate that he knew of the improper vendor income reporting or that the incorrect reporting was obvious. *See* Sept. 12, 2006 Order at 12. Plaintiffs have not supplemented the Amended Complaint with such allegations, nor are there any allegations that Crumley was aware of the purported "red flags" that plaintiffs assert should have put defendants on notice of such problems. *See* Pl.'s Opp. 14. Crumley's signature on the SEC filings and Sarbanes Oxley certifications stating he had personally evaluated and certified the effectiveness of the Company's disclosure controls and procedures does not suffice to allege scienter without allegations that Crumley was aware of the material weaknesses in its internal controls over financial reporting at the

time he signed those statements or that such weaknesses were obvious.  *See Abrams*, 292 F.3d at 432.  Plaintiffs' argument that Crumley had detailed knowledge of the Company's accounting for vendor income and ignored red flags alerting him to the accounting fraud at OfficeMax is unavailing without allegations that Crumley was aware of those red flags and thereby recklessly disregarded the risk of accounting fraud.  There are also no allegations that Crumley was aware of the internal investigation or the events leading up to its commencement prior to December 20, 2004.  Count I is dismissed as to Crumley because the complaint does not adequately allege scienter as to him.

### G. Harad

Harad was the Chairman and CEO of Boise until November of 2004.  Am. Compl. ¶ 27.  Harad received a bonus of $1.54 million for 2004 in addition to his salary of more than $1 million.  The complaint alleges that this was nearly double his bonus for 2003.  *Id.*

Harad was responsible for financial reporting and communications with the market.  Harad signed the Form 10-K and Sarbanes-Oxley certifications for the year ending December 31, 2003 and the Sarbanes-Oxley certifications for the first and second quarters of 2004.  Harad also certified that he personally supervised the evaluation of the design and operation of the Company's disclosure procedures and internal controls pursuant to Rule 13a-15(e) of the 1934 Act (§ 392 of Sarbanes-Oxley).  *Id.* ¶ 33.

This court previously held that although Harad was the leader of the Company during the Class Period, and was involved in certifying financial statements and received significant financial compensation, plaintiffs had failed to allege scienter because there was nothing in the complaint to suggest that Harad was aware of other employees'

improper recording of vendor income or that those employees' activities were obvious. *See* Sept. 12, 2006 Order at 13. Plaintiffs' Amended Complaint does not remedy this defect. Rather, plaintiffs rely on the same allegations that have been discussed above to plead scienter. As was the case with Crumley and Milliken, Harad's signature on the SEC filings and Sarbanes Oxley certifications stating he had personally evaluated and certified the effectiveness of the Company's disclosure controls and procedures does not suffice to plead scienter without allegations that Harad was aware of the material weaknesses in its internal controls over financial reporting at the time he signed those statements or that such weaknesses were obvious. As is the case with the other defendants, plaintiffs' argument that Harad ignored "obvious red flags" alerting him to the accounting fraud at OfficeMax is unavailing without allegations that Harad was aware of those red flags. There are no allegations that Harad was aware of the internal investigation prior to its announcement. Count I is dismissed as to Harad because the complaint does not adequately allege scienter as to him.

### H. OfficeMax

Plaintiffs argue that OfficeMax can be directly liable for violating the federal securities laws even if plaintiffs have not sufficiently pled scienter as to any of the defendants who made the allegedly misleading statements. Pl.'s Opp. 21-22. Though the Seventh Circuit has not yet ruled on this issue, at least one district court in the Northern District of Illinois has adopted the holdings of the Fifth and Ninth Circuits that a defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of fraud. *See Higginbotham*, 2005 WL 1272271, at *7 (plaintiffs failed to allege scienter as to

corporate defendant when they failed to allege scienter as to any of the defendants who had made the alleged misrepresentations).  In *Southland*, the Fifth Circuit stated, "For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  365 F.3d at 366-67; *see also Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("there is no case law supporting an independent 'collective scienter' theory")); *c.f. Caterpillar, Inc. v. Great American Insurance Co.*, 62 F.3d 955, 963 (7th Cir. 1995) (citing *Nordstrom* with approval and noting that although there are "conceivable situations" where individual actors would not be liable but their corporate employer would be—i.e., where a case depends on the collective scienter of its employees or where defenses are available to individuals but not the corporation, there is little caselaw supporting an independent corporate scienter theory).

Here, plaintiffs have not been able to plead scienter as to any of the defendants who made the allegedly false and misleading statements.  Although there may be circumstances under which a plaintiff who is unable to plead scienter as to individual corporate officers may still be able to plead scienter as to the corporate defendant, the court is not persuaded that any such circumstances are present.  First, this is not a case where individual defenses preclude plaintiffs from recovering against the individual defendants.  Second, to the extent that collective scienter is available, plaintiffs'

allegations are too vague to support an inference that OfficeMax collectively intended to deceive shareholders. For example, plaintiffs do not even identify the individuals at OfficeMax who knew about the improper vendor reporting at the time the allegedly false and misleading statements were made. *Compare Caterpillar, Inc.*, 62 F.3d at 963 ("[R]egardless of whether corporate liability is legally direct or derivative, a corporation must still act through its agents."). Therefore, plaintiffs' claim against OfficeMax must be dismissed for failure to plead scienter as well.

### I. Section 20(a)

Because plaintiffs have failed adequately to allege a primary violation under Section 10(b), Count II must also be dismissed. *See* Sept. 12, 2006 Order 14 ("Claims of control-person liability under Section 20(a) [of the Securities Exchange Act, 15 U.S.C. § 78(t)] are derivative claims, and thus are actionable only if plaintiffs adequately allege a primary violation under [Section] 10(b).") (quoting *Premier Capital Management, L.L.C. v. Cohen*, No. 02 C 5368, 2003 WL 21960357, at *9 (N.D. Ill. Aug. 15, 2003)).

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.


ENTER:

        /s/
_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 26, 2007